UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Elena Shchegoleva

      v.

Oleg Shchegolev et al.

Case No. 26-cv-261-SE-AJ
Opinion No. 2026 DNH 090

# **O R D E R**

On April 6, 2026, Elena Shchegoleva brought suit against her ex-husband, Oleg Shchegolev; two trusts, The Oleg Shchegolev Irrevocable GST Trust of 2020 (GST Trust) and The Oleg Shchegolev Irrevocable Non-Exempt Trust of 2020 (Non-Exempt Trust); and the current and former trustees of the Non-Exempt Trust, Jade Strategic Advisors LLC (Jade) and IQ EQ Trust Company U.S., LLC, f/k/a Concord Trust Company (IQ EQ),[1] respectively.[2] Broadly speaking, the complaint alleges that Oleg used the other defendants to orchestrate a fraudulent scheme to deprive Elena, at the time of her divorce from Oleg, of her share of approximately $1 billion of jointly owned marital assets. When Elena filed the complaint, these assets consisted primarily of shares of Semrush Holdings, Inc., a publicly-traded company which Oleg co-founded. According to the complaint, Oleg and his agents had recently executed an all-cash sale of Semrush to Adobe, Inc. (the Adobe transaction), which was expected to and ultimately did close in the first half of 2026.

---

[1] IQ EQ is also the current trustee of the GST Trust.

[2] The complaint also named as defendants certain other limited liability companies. These LLCs are not central to the present order, and, therefore, the court does not include the LLCs when it refers to "the defendants" herein.

Shortly after she filed her complaint, Elena filed a motion for a temporary restraining order, asking the court to restrain the defendants from hypothecating or otherwise dissipating the Semrush shares or any proceeds received in exchange for those shares upon the closing of the Adobe transaction. Doc. no. 7. Elena and some of the defendants subsequently entered into a stipulation in lieu of a temporary restraining order. Doc. no. 27. Jade refused to join the stipulation.

On May 8, 2026, the court held a hearing on the motion for a TRO. The court denied the motion as to all parties other than Jade in light of the stipulation, but granted the motion as to Jade, ordering that "[u]ntil June 15, 2026, Jade shall be subject to the obligations and restrictions imposed upon IQ EQ Trust Company U.S., LLC pursuant to the stipulation, as if Jade were a party thereto." May 8, 2026 End. Or.

Elena then moved for a preliminary injunction against Jade. Doc. no. 48. Jade objected (doc. no. 51) but agreed to "comply with the same obligations as IQ EQ under the Joint Stipulation until the earlier of June 30 or the issuance of the Court's order on Plaintiff's Motion for Preliminary Injunction." Doc. no. 49, ¶ 6(b).

The court held an evidentiary hearing on Elena's motion on June 17, 2026, and June 22, 2026. The parties agree that the court may consider an affidavit submitted by Christopher Martin, President of Private Wealth at IQ EQ, in lieu of Mr. Martin's live testimony. They also stipulate as to certain exhibits. Doc no. 63. The parties agree that all other evidence the court may consider in support of or in opposition to a preliminary injunction against Jade was presented as live testimony from five witnesses who were subject to cross-examination. Elena did not testify. Consequently, many of the facts alleged in the complaint are not before the court on this motion.

Background

Oleg and Elena married in 2001. They have three children, two of whom have yet to reach the age of 18. At some point during their marriage, Oleg co-founded Semrush, a company that provides search engine optimization and artificial intelligence technology.

Between November 2019 and September 2020, Oleg established four trusts: the GST Trust, the Non-Exempt Trust, The Oleg Shchegolev Grantor Retained Annuity Trust I (GRAT I), and The Oleg Shchegolev Grantor Retained Annuity Trust II. Oleg's lawyer, Michael Bass, drafted the trust documents for all four trusts. Oleg and Bass organized both the GST Trust and the Non-Exempt Trust under New Hampshire law and designated IQ EQ as the trustee of both. Those trusts named Elena and the couple's three children as beneficiaries and Oleg as the donor. The Non-Exempt Trust, which is the trust at issue in Elena's preliminary injunction motion, named Elena as Trust Advisor.

The Non-Exempt Trust instrument contained a provision that the parties referred to in their pleadings and during the preliminary injunction hearing as a "Deemed Death Clause." Under that clause, as relevant here, Elena's beneficiary rights would automatically terminate upon Oleg filing for divorce. Both Bass and Oleg testified that they did not recall specifically discussing the Deemed Death Clause. Bass and other witnesses testified, however, that it is a common provision in instruments for trusts such as the Non-Exempt Trust, which Bass described as a Spousal Lifetime Access Trust, or a SLAT.

In June 2023, Elena signed a document giving Oleg durable power of attorney in the event of her incapacitation. Doc. no. 1-3. Contrary to the allegations in the complaint, the parties now agree that Elena has not become incapacitated since she signed that document, and Oleg has not been empowered to or exercised any rights under that power of attorney.

On September 21, 2023, Bass replaced IQ EQ as the trustee of the Non-Exempt Trust. Ex. 12. Bass testified at the hearing that this change was made because the GRAT I trust, which held a large number of Semrush shares, was set to terminate on September 29, 2023, and distribute its assets to the Non-Exempt Trust pursuant to the GRAT I trust terms. Ex. A, Article Three ¶ C-D. Unlike IQ EQ, which based its trustee fees on the amount of assets in the trust, Bass charged an hourly rate. His fees as trustee, therefore, would be less expensive than IQ EQ's fees would be once the Semrush shares were transferred into the Non-Exempt Trust. Prior to the transfer of the shares from the GRAT I trust, the Non-Exempt Trust contained just $10 from its initial funding.

On June 20, 2024, Oleg executed a document that exercised his right to remove Elena as the Trust Advisor of the Non-Exempt Trust. Ex. 25. He appointed himself as the Trust Advisor on that same date. Id. Bass, as trustee, did not acknowledge receipt of the document until January 6, 2025.[3] Id. at 2. Under the Non-Exempt Trust instrument, the Trust Advisor "shall exercise the powers granted by this Trust agreement solely in a fiduciary capacity and never for the Trust Advisor's personal benefit." Ex. 6, Article Eleven ¶ C(2).

On February 17, 2025, Oleg filed for divorce in Barcelona, Spain. The divorce was finalized approximately a year later on February 20, 2026. Elena and Oleg are still litigating the division of their marital assets.

During his time as trustee, Bass performed all tasks pertaining to the Non-Exempt Trust in Massachusetts, where he both lived and worked as an attorney. The Trust's address, listed on

---

[3] Bass testified that he did not know why there was a several month delay between Oleg's signature and Bass's acknowledgment of receipt of the document.

the Trust instrument, remained 3 Executive Park Drive, Suite 302, Bedford, New Hampshire 03110, the address of the prior trustee, IQ EQ.

At some point shortly before March 17, 2026, Oleg asked Bass to resign as trustee of the Non-Exempt Trust. Both Bass and Oleg testified that the Adobe transaction's impending closing induced Oleg's request. Once that closing occurred, several hundred million dollars would flow into the Non-Exempt Trust. Oleg and Bass thought that these assets could be subject to Massachusetts state taxes if Bass remained the trustee. They thought that they could better preserve Trust assets if they transferred the Trust to a state with lower or no income taxes. Therefore, Bass resigned as trustee of the Non-Exempt Trust on March 17, 2026. Ex. 13. Oleg appointed Jade as trustee the following day. Id.

Jade is a limited liability company that was organized under Wyoming law on March 8, 2026, and which the Wyoming Division of Banking recognizes as a private family trust company. It is owned and managed by Sub Rosa Discretionary Services LLC, a Wyoming limited liability company that is owned by Attorneys Michael Rosenblum and Olga Galanter. Both Rosenblum and Galanter reside in Florida, though Rosenblum is licensed to practice law in several jurisdictions, including Wyoming.

Oleg recalled that his financial advisor, Andrew Sukhin of Raymond James, recommended Galanter as a possible trustee. Rosenblum and Galanter testified that they agreed to involve themselves with the Non-Exempt Trust only if they could avoid any potential personal liability by operating a Wyoming private family trust company to serve as the trustee. Rosenblum testified that he and Galanter chose Wyoming because it allows the formation of unregulated family trust companies and has no state income tax. He is also admitted to the Wyoming bar. Though New Hampshire has no state income tax, Rosenblum testified that he is

not admitted to the state's bar and New Hampshire imposes more restrictions on family trust companies than does Wyoming.

On March 18, 2026, the day Oleg appointed Jade as the trustee of the Non-Exempt Trust, Jade executed a "transfer of situs" document. Ex. 14. The document invokes Article Seventeen of the Trust, which it describes as allowing the trustee to, "at any time and in its sole and nonreviewable discretion, remove the situs of administration of the Trust from one jurisdiction to another jurisdiction, and elect that the substantive laws of such other jurisdiction shall thereafter govern the Trust (other than laws of construction which shall continue to be governed by New Hampshire law)." Id. at 1. The document, which Bass drafted, transferred the situs of the Non-Exempt Trust to Wyoming and elected Wyoming law to govern the trust. Id. The sentence designating Wyoming as the new situs does not state the then-existing location of the situs. Instead, it states that Jade "hereby transfers the situs of the Trust from to [*sic*] the State of Wyoming . . . ." Id. Despite these changes, a Raymond James bank statement for the Trust listed the "bank priority state" as "NH" as recently as May 2026. Ex. 15.

The Non-Exempt Trust permits the appointment of a Trust Protector, an individual or entity whose duties are defined by the Trust's terms but who generally serves as an independent, non-fiduciary manager of the trust. Among other broad powers, the Non-Exempt Trust instrument grants the Trust Protector "the power to revoke or release, in whole or in part, any of the provisions which cause the Trust to be classified as a Grantor Trust under the Code." Ex. 6, Article Twenty-One ¶ M. Relevant to the parties' dispute in this case, the grantor status that may be revoked by the Trust Protector leaves the Trust's tax liability with the donor of the Trust rather than with the Trust itself.

6

In light of the impending Adobe transaction and the accompanying significant potential federal tax liability, Oleg began looking for a Trust Protector to remove the grantor status to shift the tax liability resulting from the sale of the Non-Exempt Trust's Semrush shares. In other words, Oleg wanted the Non-Exempt Trust, which would be receiving the proceeds of the sale, to pay out of those proceeds the potential tax liability incurred as a result of those proceeds. In early March 2026, Oleg asked his longtime friend and co-founder of Semrush, Dmitry Melnikov, to consider serving as the Trust Protector. After discussing it over email, Melnikov declined to serve as Trust Protector, in part because of Elena and Oleg's acrimonious divorce and Melnikov's wife's close relationship with Elena.

On April 17, 2026, pursuant to paragraph A of Article Twenty of the Non-Exempt Trust instrument, the partners of Bass's law firm appointed Artem Holub as Trust Protector of the Non-Exempt Trust. Ex. 19. Oleg testified that Holub, whom he has never met, was recommended by several of their mutual friends as well as by Sukhin. On April 20, 2026, Holub revoked the Non-Exempt Trust's grantor status. Ex. 20. Four days later, Bass's firm removed Holub as the Trust Protector. Ex. 21. Bass testified that it is good practice to employ a Trust Protector only when there is an immediate need for action, particularly in light of the broad powers that the Trust instrument grants to the position. Oleg paid Holub $60,000 for acting as the Trust Protector.

Elena brought this suit, asserting nine claims against Oleg, the GST Trust, the Non-Exempt Trust, IQ EQ, Jade, and other entities. With regard to the Non-Exempt Trust or Jade directly, Elena asserts the following counts: fraudulent transfer under RSA 545-A:4, I(a) (Count II); fraudulent transfer under RSA 545-A:4, I(b) (Count III); invalid trust (Count VI); unjust enrichment and constructive trust (Count VII); and accounting (Count VIII).

7

Standard of Review

"'A preliminary injunction is an extraordinary remedy never awarded as of right.'" Capen v. Campbell, 134 F.4th 660, 666 (1st Cir. 2025) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)). "In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." Id. (quotations omitted). "The first of these factors is a necessary condition: If the movant fails to demonstrate a likelihood of success on the merits, the remaining elements are of little consequence." Id. (quotations omitted). "[A] court's conclusions as to the merits of the issues presented on preliminary injunction are to be understood as statements of probable outcomes." Id. (quotations omitted).

Discussion

Elena moves for a preliminary injunction restraining Jade from hypothecating or otherwise dissipating any assets in the Non-Exempt Trust. Jade objects, arguing that it is not subject to personal jurisdiction in New Hampshire and that, even if it is, Elena cannot show that any of the four preliminary injunction factors weighs in her favor.

I.      Personal Jurisdiction

Where, as here, the court is exercising diversity jurisdiction, it acts "as the functional equivalent of a state court sitting in the forum state." Rosenthal v. Bloomingdales.com, LLC, 101

8

F.4th 90, 94-95 (1st Cir. 2024). "As a result, to meet [her] ultimate burden to establish personal jurisdiction over [Jade] in New Hampshire, [Elena] must satisfy the requirements of both New Hampshire's long-arm statute -- which defines the scope of personal jurisdiction over a defendant in that state's courts -- and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." Stokinger v. Armslist, LLC, 166 F.4th 229, 233 (1st Cir. 2026). "New Hampshire's long-arm statute authorizes the exercise of personal jurisdiction . . . to the extent permissible under the [f]ederal Due Process clause," In re Reddam, 170 N.H. 590, 595 (2018). Therefore, courts generally treat New Hampshire's long-arm statute as "coextensive with the outer limits of due process." Cappello v. Rest. Depot, LLC, 89 F.4th 238, 243 (1st Cir. 2023) (quotations omitted).

To satisfy that standard, Elena must show that Jade had "certain minimum contacts with [New Hampshire] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). "Those contacts may be marshalled to support a theory of either general or specific jurisdiction." Stokinger, 166 F.4th at 233. As to Jade, Elena relies on a theory of specific jurisdiction. See doc. no. 1, ¶ 31. Therefore, Elena must show that it is likely that she can "satisfy each prong of the specific-jurisdiction test: (1) relatedness, (2) purposeful availment, and (3) reasonableness." Stokinger, 166 F.4th at 233.

A district court in the First Circuit may employ one of three different approaches when evaluating personal jurisdiction. The prima facie test is the "most commonly used method of determining [the existence of] personal jurisdiction," under which the district court considers "only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st

9

Cir. 1992). "A second option open to the court is to embark on a factfinding mission in the traditional way, taking evidence and measuring the plaintiff's jurisdictional showing against a preponderance-of-the-evidence standard." Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145 (1st Cir. 1995). Finally, the First Circuit has offered a "middle course" in which the district court engages "in some differential factfinding, limited to probable outcomes as opposed to definitive findings of fact . . . in order to determine whether the plaintiff has shown a likelihood of the existence of each fact necessary to support personal jurisdiction." Digital Equip. Corp. v. AltaVista Tech., Inc., 960 F. Supp. 456, 464 (D. Mass. 1997) (quoting Foster-Miller, 46 F.3d at 146) (quotations omitted). This middle course is particularly appropriate at the preliminary injunction stage, and so the court employs it here. Id. ("Since the preliminary injunction motion presently before me also requires findings of fact based on a comparable standard, and since some facts supporting jurisdiction may be bound up with the claim on the merits, the intermediate test seems a particularly appropriate course." (quotations and citation omitted)).

Jade argues in its objection that Elena fails every factor of the test for specific jurisdiction because it is a Wyoming company, the Non-Exempt Trust's situs is in Wyoming, and Jade has not engaged in any activities in New Hampshire. Elena does not directly address the prongs of the jurisdictional analysis. Instead, she argues that Jade is subject to the court's specific personal jurisdiction for three reasons. First, Jade submitted to the court's jurisdiction when it accepted the trusteeship of the Non-Exempt Trust. Second, Jade's attempt to change the Trust's situs to Wyoming is invalid under New Hampshire law and cannot extinguish jurisdiction. Third, Jade is Oleg's alter ego, and Oleg's New Hampshire contacts are sufficient to establish personal jurisdiction.

10

A.    Acceptance of Trusteeship

Elena relies on RSA 564-B:2-202(a) to support her first argument. That section provides:

"By accepting the trusteeship of a trust having its principal place of administration in this state or

by moving the principal place of administration to this state, the trustee submits personally to the

jurisdiction of the courts of this state regarding any matter involving the trust." Elena's

likelihood of success on this theory largely depends on whether the Non-Exempt Trust's

principal place of administration (PPOA) or situs[4] was New Hampshire when Jade accepted the

trusteeship. Jade argues that the Trust's PPOA was Massachusetts at that time.

RSA 564-B:1-108 governs a trust's PPOA under New Hampshire law. Relevant here,

RSA 564-B:1-108(a) provides:

> Without precluding other means for establishing a sufficient connection with the
> designated jurisdiction, terms of a trust designating the principal place of
> administration are valid and controlling if:
>
> (1) a trustee's principal place of business is located in or a trustee is a resident of
> the designated jurisdiction; or
>
> (2) all or part of the administration occurs in the designated jurisdiction.

RSA 564-B:1-108(f) states:

> Unless otherwise provided under the terms of the trust or an agreement among the
> trustees, a trust has a principal place of administration in this state if (1) a trustee's
> principal place of business is located in this state or, if a trustee is an individual,
> that trustee is a resident of this state and (2) all or part of the administration occurs
> in this state.

The parties agree that Bass was not a resident of New Hampshire and did not have his

principal place of business in New Hampshire when Jade accepted the trusteeship. Because RSA

---

[4] The court uses PPOA and situs interchangeably.

564-B:1-108(f) requires both that Bass was a resident of New Hampshire when Jade accepted the trusteeship and that all or part of the Non-Exempt Trust's administration was then occurring in New Hampshire, Elena will not be able to establish under RSA 564-B:1-108(f) that New Hampshire was the PPOA when Jade accepted the trusteeship. Thus, Elena can only proceed under RSA 564-B:1-108(a). Given the evidence regarding Bass's residency, Elena can only establish under that section that New Hampshire was the PPOA when Jade accepted the trusteeship if she can show that the Non-Exempt Trust instrument designates New Hampshire as the PPOA and that all or part of the Non-Exempt Trust's administration was then occurring in New Hampshire.

It is true, as Jade concedes, that the instrument's text "implies that the initial PPOA will be New Hampshire." Doc. no. 51-1 at 6. That is understandable, given that the initial trustee (IQ EQ) was located in New Hampshire and administered the Trust in the state, and that Oleg resided in New Hampshire when he created the Trust. But the Trust instrument's plain language does not designate a PPOA, New Hampshire or otherwise.

Elena contends that the Non-Exempt Trust's choice of New Hampshire law to govern the Trust's validity and administration suffices to designate New Hampshire as the PPOA. But Article Seventeen of the Non-Exempt Trust instrument specifies that "notwithstanding" the choice of New Hampshire law, "the Trustee may change the situs of administration . . . from one jurisdiction to another jurisdiction, in which case the tax and other laws of such other jurisdiction . . . shall apply.". Ex. 6, Article Seventeen ¶ B. It goes on to state that the trustee's "power to change the situs of administration shall be a continuing power which may be exercised by the Trustee at any time or from time to time" and is "conclusive and binding on all persons interested or claiming to be interested in" the trust. Id. On their face, these provisions make it

12

clear that the Trust's choice of New Hampshire law is wholly divorced from any designation of situs. Moreover, Elena offers no support for the assertion that provisions regarding a trust's governing law could serve to designate a trust's PPOA. To the contrary, New Hampshire law provides separate statutes addressing a trust's governing law and its PPOA. Compare RSA 564-B:1-107 with RSA 564-B:1-108; see also Thomas P. Gallanis, Trusts and the Choice of Law: What Role for the Settlor's Choice and the Place of Administration?, 97 Tul. L. Rev. 805, 818 (2023) ("A settlor is free to designate one jurisdiction as the principal place of administration and another to govern the meaning and effect of the trust's provisions." (quoting UNIF. TR. CODE § 108 cmt.)).

Because the terms of the Trust do not designate New Hampshire as the PPOA, Elena cannot proceed under RSA 564-B:1-108(a). Elena's reliance on evidence showing that the Trust's mailing address remained in New Hampshire during Bass's trusteeship or that the Raymond James bank statement from 2026 states that the "bank priority state" was in New Hampshire, Ex. 15, is misplaced. Elena fails to show how these contacts with New Hampshire are sufficient to constitute administration of the Trust. Importantly, even if they did constitute administration or partial administration, that alone is insufficient to establish that New Hampshire is the Non-Exempt Trust's PPOA unless the Non-Exempt Trust instrument also designates New Hampshire as the PPOA, which it does not.

Elena offers two additional arguments to establish that New Hampshire was the Non-Exempt Trust's PPOA when Jade accepted the trusteeship so that this court can exercise jurisdiction pursuant to RSA 564-B:2-202(a). First, she contends that the Trust's PPOA could not have changed from New Hampshire to Massachusetts because Bass never exercised his power to change the Trust's PPOA with a formal document. That argument does not withstand

scrutiny. Article Seventeen of the Non-Exempt Trust instrument does not require any formality to change the Non-Exempt Trust's situs. Rather, it provides simply that the trustee may change the situs "at any time." Ex. 6, Article Seventeen ¶ B. And Elena has not shown that any such formal document is required under New Hampshire law.

Second, Elena argues that Bass "was no independent intervening fiduciary." Doc. no. 61 at 4. Instead, he was Oleg's personal estate lawyer, and thus Bass's appointment as trustee represented a "scheme operating, not a bona fide change in the place of administration." Id. at 5. That is not supported by the record at this stage of the proceedings. Rather, the evidence offered at the preliminary injunction hearing shows that Bass's appointment as trustee and his administration of the Non-Exempt Trust were legitimate. There was no evidence of improper motive or any reason that his involvement somehow nullified the change in PPOA to Massachusetts.

When Jade accepted the trusteeship of the Trust in March 2026, the Trust's PPOA was in Massachusetts.[5] Bass was the trustee at that time and had been since September 2023. Bass testified that he lived and practiced law in Massachusetts during his time as the trustee and that he did not administer any part of the Non-Exempt Trust in New Hampshire. Thus, Bass changed the Trust's situs pursuant to his rights under Article Seventeen, the Trust's PPOA was Massachusetts when Jade accepted the trusteeship, and Elena has not shown a likelihood of success of establishing jurisdiction via RSA 564-B:2-202(a).

---

[5] Bass stated at one point in his testimony that the Non-Exempt Trust's situs transferred "from New Hampshire to Wyoming." However, the court can reach no other conclusion than to find that this was an unintentional misstatement. It is completely inconsistent with the rest of his extensive testimony confirming that the situs transferred from New Hampshire to Massachusetts when he became the trustee and that it was subsequently transferred to Wyoming to avoid tax liability that it might incur specifically because its situs was Massachusetts.

B.    Validity of Situs Change

Elena next argues that Jade's attempt to change the Non-Exempt Trust's situs to Wyoming is invalid under New Hampshire law. She relies on RSA 564-B:1-108(d) which provides: "The trustee shall notify the qualified beneficiaries of a proposed transfer of a trust's principal place of administration not less than 60 days before initiating the transfer." As Rosenblum conceded during his testimony, Jade did not notify the Non-Exempt Trust's beneficiaries 60 days before initiating the transfer of situs. Elena argues that, as a result of this failure to notify the trust beneficiaries, New Hampshire remains the situs of the Non-Exempt Trust.

That argument suffers from several flaws. First, as discussed, the Non-Exempt Trust's PPOA was Massachusetts, not New Hampshire, when Jade changed the situs to Wyoming. Therefore, even if Elena were correct that Jade's attempt to change the Non-Exempt Trust's situs to Wyoming were void, the Trust's PPOA would remain in Massachusetts.[6]

Second, Elena has not shown that a trustee's failure to give advance notice of a change in PPOA to a trust's beneficiaries under RSA 564-B:1-108(d) voids the action. Nothing in the statute dictates voiding the PPOA change as the appropriate remedy for failing to give notice. If Jade had a statutory duty to notify the beneficiaries, the failure to do so would be a breach of trust, which the court could remedy in any number of ways. See RSA 564-B:10-1001 (listing potential actions a court may take to remedy a violation of a duty the trustee owes to a

---

[6] The court notes that the evidence shows that Bass did not notify any beneficiaries of a change in the Trust's PPOA to Massachusetts. To the extent that Elena intended to argue that this lack of notice rendered any change in the Trust's PPOA to Massachusetts void, that argument lacks merit for the reasons discussed below.

beneficiary). Voiding the PPOA change would be a particular stretch under the circumstances presented here. Even if Elena could show that Jade was required to provide notice to the beneficiaries when it changed the Non-Exempt Trust's situs, Elena was not a beneficiary at that time. She was therefore not entitled to notice or the opportunity to object on her own behalf. She would have been entitled to receive notice only as the parent of her minor children who are beneficiaries. She has not shown or even argued that her minor children were injured by the PPOA change to Wyoming or that she can exercise her minor children's alleged notice rights for her own benefit in this case.

More importantly, however, Elena has not shown that RSA 564-B:1-108(d) applies to the Non-Exempt Trust. The New Hampshire Trust Code lists certain provisions governing trusts that cannot be altered by a trust instrument. RSA 564-B:1-105(b). The notice requirement under RSA 564-B:1-108(d) is not among those provisions and, consequently, a trust instrument can supplant that provision. As discussed, Article Seventeen of the Non-Exempt Trust instrument allows a trustee to change the Trust's situs "at any time" and does not require any notice to the beneficiaries. Ex. 6, Article Seventeen ¶ B.

Plainly, there would be no reason for notice because the trustee's decision to change the situs is "conclusive and binding on all persons interested or claiming to be interested in" the trust. Id. If the Trust instrument simply permitted the trustee to change the situs and was silent as to notice, timing, and beneficiary objections, the court may reach a different conclusion. But the instrument permits the trustee to change the situs "at any time" and makes clear that the trustee's power is not diminished by any beneficiary's objection. These provisions are necessarily contrary to the statute's implicit restriction on the timing of any change of situs by requiring the trustee to provide notice "not less than 60 days before initiating the transfer" and its explicit

16

termination of the trustee's power to change the situs if the majority of qualified beneficiaries objects prior to the deadline contained in the notice. RSA 564-B:1-108(d)-(e). Because the trust conflicts with the statute with respect to a modifiable statutory provision, "the terms of [the] trust prevail." RSA 564-B:1-105(b). Indeed, Rosenblum testified that he relied on the instrument's language when Jade did not notify the Non-Exempt Trust's beneficiaries of the change in situs. Therefore, Elena has not shown that RSA 564-B:1-108(d) applies to the Non-Exempt Trust.[7]

C.      Alter Ego

Jade's last argument to establish personal jurisdiction is that Jade is Oleg's alter ego, and therefore Oleg's New Hampshire contacts should be imputed to Jade. This argument requires little discussion. There was no evidence presented at the preliminary injunction hearing to support the notion that Jade is Oleg's alter ego. In fact, the evidence supports the contrary conclusion that Jade is an independent entity that is owned and managed by professionals who seek to operate in a manner consistent with their fiduciary obligations to the Non-Exempt Trust's beneficiaries. Elena relies on nothing more than unsupported innuendo, nearly all of which was directly belied by the evidence presented at the preliminary injunction hearing. She has not shown that her alter ego theory is likely sufficient to support her theory of personal jurisdiction.

---

[7] To the extent that Elena suggests that the change of situs document's failure to specify the location of the Trust's then-existing situs somehow renders the document ineffective, that argument is without merit. Although Elena looks at the omission as an indication of fraud, there is no evidence to support her belief that the absence of the then-existing situs in that document was anything more than a typographical error.

D.    Preliminary Injunction Denied

Elena bears the burden of showing that the court likely has personal jurisdiction over Jade. She has not carried that burden. Her motion for a preliminary injunction is therefore denied on that basis. Because Elena has also failed to show a likelihood of success on the merits of her claims or that she will suffer irreparable harm absent injunctive relief, the court briefly addresses those preliminary injunction factors.

II.    Likelihood of Success on the Merits

Elena argues that she can show a likelihood of success on her claims of fraudulent transfer under RSA 545-A:4, I(a) (Count II); fraudulent transfer under RSA 545-A:4, I(b) (Count III); invalid trust (Count VI); and unjust enrichment and constructive trust (Count VII). She has not carried her burden as to any of her claims.

A.    Fraudulent Transfer

RSA 545-A:4, I provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (2) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

18

Elena has presented no direct evidence of actual intent to defraud. Pursuant to Section II of the statute, her Count II may still succeed under RSA 545-A:4, I(a), if she can show that the facts and circumstances surrounding the transfer cumulatively establish actual intent. The statute suggests certain factors that the court may consider when making this determination, including among others whether the "transfer or obligation was to an insider," the "debtor retained possession or control of the property transferred after the transfer," and whether "the transfer or obligation was disclosed or concealed." Though RSA 545-A:4, I(b), Elena's Count III, does not require fraudulent intent, it does require, among other things, proof that Oleg was engaged in or was about to be engaged in a transaction for which his remaining assets were unreasonably small, or that Oleg believed or reasonably should have believed that he would incur debts beyond his ability to pay.

Assuming without deciding that Elena constitutes a creditor under the statute, there is simply no evidence to support her claims of a fraudulent transfer. The evidence offered at the preliminary injunction hearing shows that the trusts at issue in this case were routine estate-planning documents containing standard clauses. There is no evidence that the trustees administering the Non-Exempt Trust are insiders. The trustees were and are professional, independent fiduciaries and have acted at all times in the best interest of the Trust's beneficiaries.[8] Oleg and his agents changed the trustees for legitimate and lawful reasons. The

---

[8] To the extent that Elena argues that cancelling the grantor status of the Trust was not in the best interests of the beneficiaries because it imposed potential tax liabilities upon the Trust, that does not advance her claims. The Trust specifically reserved that power to an independent Trust Protector. The evidence shows that the grantor status and its removal were common estate planning activities justified by the nature of the trust assets and the timing of the sale of the Semrush shares.

evidence in the preliminary injunction record establishes that Oleg has not retained possession or control beyond that typically retained by trust grantors. Oleg's remaining control over the assets is limited and imposes fiduciary duties upon him. Moreover, Oleg made no attempt to conceal the Non-Exempt Trust upon its creation. Instead, Elena was a beneficiary. In short, there is nothing in the record at the preliminary injunction stage to suggest that Oleg took any actions to hinder, delay, or defraud. Elena has not shown a likelihood of success on Count II.

Additionally, Elena has presented no evidence that Oleg was engaged in or was about to be engaged in a transaction for which his remaining assets were unreasonably small, or that Oleg believed or reasonably should have believed that he would incur debts beyond his ability to pay when he made the challenged transfers. The "transaction" and "debts" underpinning Elena's claims are the parties' divorce and the distribution of marital assets. Oleg testified that he was not contemplating divorce when he created the four trusts in 2020. There is no evidence in the record to suggest that he should have believed at that time that creating and funding the trusts would leave him with insufficient assets to distribute to Elena her share of marital property because there is no evidence that he should have believed that he and Elena would divorce. Bass testified that he would not prepare a SLAT, such as the Non-Exempt Trust, if the donor intended to divorce the beneficiary spouse.

The transfers at issue were then all made by operation of those trust instruments. To find a likelihood of success on this record would render any transfer into a SLAT with a commonplace "Deemed Death Clause" a fraudulent transfer in violation of RSA 545-A:4, I(b). Elena has not shown a likelihood of success on Count III.

B.    Invalid Trust

RSA 564-B:4-406(a) provides that a "trust is void to the extent that . . . its creation was induced by fraud, duress, or undue influence." Initially, Elena cannot show a likelihood of success on this claim because she has not shown that she created the Non-Exempt Trust. Although she alleged otherwise in her complaint and her motion for a preliminary injunction, Elena conceded through counsel at the hearing that there is no evidence that she executed any trust document.

Nonetheless, she maintained during oral argument that she is likely to succeed on her claim because her consent was necessary to create the Trust. She is mistaken. Elena argues that Oleg could not create the Non-Exempt Trust without her consent because the parties' later Spanish divorce proceeding was required to apply Russian law and, under Russian law, the Semrush shares would be community property. Those issues may be relevant to a divorce court's calculation of the value of Elena's share of the marital property upon division, but they are not relevant to whether New Hampshire law required Elena's consent to create and fund the Trust, especially in the context of a claim, separate from any marital proceedings, that the Trust is invalid. Because the only evidence on the matter establishes that Elena did not need to consent to anything to create the Trust or to make transfers into it pursuant to the terms of the GRAT I trust, she did not need to take any relevant actions to form the Trust that could have been the result of any alleged fraud, duress, or undue influence. In any event and regardless of whether Elena believes that she should have been asked, it is undisputed that no one asked for Elena's consent and she did not give it. Thus, she was not induced by fraud, duress, or undue influence to create the Non-Exempt Trust.

21

Also, Elena has not identified any fraudulent misrepresentation. "To establish fraud, a plaintiff must prove that the defendant made a representation with knowledge of its falsity or with conscious indifference to its truth with the intention to cause another to rely upon it." Snierson v. Scruton, 145 N.H. 73, 77 (2000). "In addition, a plaintiff must demonstrate justifiable reliance. A plaintiff cannot allege fraud in general terms, but must specifically allege the essential details of the fraud and the facts of the defendant['s] fraudulent conduct." Id. (citation omitted). In her motion, Elena claims that Oleg falsely represented that "the Trust Deeds were: (i) innocuous tax planning instruments to avoid a 40% estate tax; (ii) important to secure the family's financial future; and (iii) designed to protect her and the Shchegolev children in the event of his untimely death." Doc. no. 48-1 at 19.[9] There is no evidence that any of these statements were false when Oleg made them. Again, Elena relies on unsupported inferences to support her claims. But the facts adduced at the preliminary injunction hearing do not support those inferences. Elena has not shown a likelihood of success on Count VI.

C.    Unjust Enrichment and Constructive Trust

A constructive trust is "a court-imposed device, essentially remedial in purpose, to achieve equitable restitution 'where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession.'" Zimmermann v. Epstein Becker & Green, P.C., 657 F.3d 80, 83 (1st

---

[9] Elena cites the allegations in her complaint as support for her contention that Oleg made these representations, but she did not present any evidence at the preliminary injunction hearing to support those allegations. Nevertheless, because the court determines that Elena has not shown that these representations were fraudulent, the court credits her allegations for the purposes of this order.

Cir. 2011) (quoting Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213 (2002)).

"The central objective [of a constructive trust] is to prevent unjust enrichment." Id. "Unjust

enrichment is an equitable remedy that is available when an individual receives a benefit which

would be unconscionable for him to retain." Walbridge v. Ne. Credit Union, 299 F. Supp. 3d

338, 347 (D.N.H. 2018) (quoting Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659, 669 (N.H.

2013) (quotations and emphasis omitted)).

As with her other claims, Elena's constructive trust claim relies on her unsupported

allegations that the trusts at issue were part of an elaborate and fraudulent scheme to deprive her

of assets and that Oleg continues to exercise control over the trusts and their assets. The evidence

shows, instead, that the assets are held in trust for the benefit of the couple's children. For the

reasons discussed above, there is no support in the preliminary injunction record for the

contention that it would be unconscionable to allow the Non-Exempt Trust to retain the assets.

Elena has not carried her burden to show that she is likely to succeed on Count VII.

III.    <u>Irreparable Harm</u>

Even if Elena could show that Jade was likely subject to personal jurisdiction in this court

and that she was likely to succeed on one or more of her claims, her motion for a preliminary

injunction would still fail because she has not shown a likelihood that she will suffer irreparable

harm absent injunctive relief.

The Non-Exempt Trust instrument requires trifurcation of the Trust into three separate

trusts upon Elena's "deemed death," with each of Oleg and Elena's three children obtaining a

separate trust. As a result, the evidence shows that the Non-Exempt Trust has already been

trifurcated, but the assets have not yet been partitioned. Elena argues that she will suffer irreparable harm if the Trust assets are partitioned.

As the parent of the two minor beneficiaries, Elena currently has oversight of the Non-Exempt Trust's disclosures and distributions. If the assets are partitioned, she will lose oversight of the trust held for the benefit of her adult child. The court is not persuaded that losing the unintended personal benefit she derives from receiving information as a parent of minor beneficiaries is a proper consideration in support of irreparable harm.

Even after partition, Oleg will not possess the trusts' assets or have access to those assets. Instead, Jade will continue to administer the trusts' assets in accordance with its fiduciary duties and in the interest of the beneficiaries. Rosenblum testified that Jade would not make any distributions that he believed would make assets unavailable for an award were Elena to prevail. Elena notes that as Trust Advisor, Oleg has and will continue to have the authority to direct investments of trust assets, and she claims that he can do so in ways that will make those assets untraceable and unrecoverable. Yet, Oleg is required to exercise his powers in a fiduciary capacity and not for his personal benefit. And, as discussed above, there was no evidence adduced at the preliminary injunction hearing to suggest that Oleg has moved or would in the future move assets in a fraudulent scheme to make them unrecoverable.

Further, Jade has offered to enter into refunding agreements between the Non-Exempt Trust and the three beneficiary trusts, which would allow assets in the latter trusts to be returned to the former if Elena prevails on her claims. Simply put, Elena has not carried her burden to show that she will likely suffer irreparable harm absent a preliminary injunction.

Because Elena has not carried her burden to show a likelihood that Jade is subject to this court's jurisdiction, that she will succeed on the merits, or that she will suffer irreparable harm

24

absent injunctive relief, the court need not address the remaining preliminary injunction factors.

See, e.g., Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 18 (1st Cir. 2020). Her motion is

denied.

Conclusion

For the foregoing reasons, the plaintiff's motion for a preliminary injunction (doc. no. 48)

is denied.

SO ORDERED

_____
Samantha D. Elliott
United States District Judge

July 15, 2026

cc:  Counsel of Record.